UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRENDAN S. WILES, )
 )
       Plaintiff, )
 )
   v. ) No. 4:13 CV 273 ERW / DDN
 )
CAROLYN W. COLVIN,[1] )
Commissioner of Social Security, )
 )
       Defendant. )

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Brendan S. Wiles for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be affirmed.

## I. BACKGROUND

Plaintiff, who was born on October 6, 1991, filed his application for SSI on January 4, 2010. (Tr. 160-62.) He alleged an onset date of disability of October 1, 2002, which was subsequently amended to his January 4, 2010 application date. Plaintiff alleged disability due to depression, anxiety, and deafness in his left ear. (Tr. 171.) His application was denied initially, and he requested a hearing before an ALJ. (Tr. 93-97.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

On November 10, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 13-21.) On December 19, 2012, the Appeals Council denied his request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On June 4, 2009, plaintiff saw Bhaskar Y. Gowda, M.D., at Pathways Community Behavioral Healthcare (Pathways) for a psychiatric evaluation. He was seventeen years old. His mood was depressed and anxious. He was easily fatigued and showed excessive nervousness, worrying, and restlessness. He experienced auditory hallucinations and simple paranoid delusions. Plaintiff reported being depressed and anxious since about twelve years old. He received good grades until the sixth grade. He had four prior hospitalizations and suicide attempts. Dr. Gowda diagnosed generalized anxiety disorder and major depressive disorder. Dr. Gowda assigned a GAF score of 60,[2] indicating mild symptoms. (Tr. 240-43.) Plaintiff saw Dr. Gowda again on six occasions through January 2010. (Tr. 235, 238, 244-46, 329-30.)

On June 29, 2009, plaintiff saw Christina Woods, MA, LPC, for individual therapy addressing his anxiety and social interactions. He reported that he struggled significantly with anxiety that impaired his daily functioning, including his education, social interactions, and task completion. Ms. Woods noted evidence of depressed mood and mood swings. Plaintiff reacted aggressively when angered, kept his feelings to himself until he lost control, and lacked healthy outlets for release. He struggled with low self-esteem and social anxiety. He felt others were judging him and viewed him as a "freak." He socially isolated himself and his anxiety made friendships difficult to maintain. (Tr. 283.)

---

[2] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity, and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM").

Plaintiff was enrolled in the eleventh grade and was being homeschooled. He had been alternating living with his mother and sister and with his grandparents for the past several years. Ms. Woods recommended weekly home therapy sessions. She assigned a GAF score of 45, indicating marked symptoms. Plaintiff was taking Celexa and Ativan, both used to treat anxiety. Her diagnoses were generalized anxiety disorder and severe depression. (Tr. 284-85.)

Plaintiff continued individual counseling with Ms. Woods from July 13, 2009 through April 26, 2010. On July 13, plaintiff appeared anxious and guarded, and they discussed triggers for his anxiety. Plaintiff stated that he felt most in control of his feelings when playing video games and that his anxiety significantly reappeared with his daily life. Ms. Woods assigned a GAF score of 45. (Tr. 286-88.)

On August 10, 2009, plaintiff reported that he was doing better interacting with family members although he isolated himself when his stepfather was home. Ms. Woods assisted him in processing anxiety and with his motivational skills. Plaintiff expressed fear of failure. (Tr. 291-97.)

During an October 26, 2009 session with Ms. Woods, plaintiff reported several recent panic attacks. In mid-November 2009, he reported increased anxiety. On November 30, 2009, plaintiff's mood was depressed. On December 14, 2009, plaintiff discussed his strained relationship with his father and his depression. (Tr. 300-03.) His medications included Celexa and the antidepressants Wellbutrin and Trazodone. (Tr. 246.)

On January 4, 2010, Brian Edwards, D.O., discontinued plaintiff's Wellbutrin and Ativan due to ineffectiveness and side effects. Plaintiff continued on Celexa and Trazodone and was started on Klonopin, used to treat panic disorder. Plaintiff reported that his anxiety was better. Plaintiff and his mother stated they were dissatisfied with the staff at Pathways because they were difficult to reach. (Tr. 252.)

On January 11, 2010, plaintiff reported some improvement in his anxiety and mood swings. (Tr. 305.) On February 3, 2010, Dr. Edwards increased his Klonopin. (Tr. 250.)

Plaintiff saw Ms. Woods five times during March and April 2010. He was attempting to complete his GED but was not feeling motivated. On April 26, 2010, plaintiff stopped seeing Ms. Woods for counseling due to lack of progress and because she had accepted a new position elsewhere. (Tr. 308-13.)

As part of his SSI application, plaintiff's claim was reviewed by a state agency medical consultant, Kyle DeVore, Ph.D. In an April 15, 2010 Mental RFC Assessment, Dr. DeVore opined that plaintiff could perform simple or greater instructions/directions and retained the ability to perform simple or greater work tasks. He was moderately limited in his ability to understand and remember very short and simple instructions; to carry out detailed instructions; and to accept instructions and respond appropriately to criticism from supervisors. Dr. DeVore believed that plaintiff may benefit from mild social restrictions. (Tr. 265-79.)

On September 1, 2010, Dr. Edwards noted that plaintiff thought that his Celexa was no longer effective for his depression. He had insomnia, lacked motivation, and needed to force himself to study and participate in GED classes. Dr. Edwards started plaintiff on Paxil, an antidepressant, and continued Klonopin and Trazodone. (Tr. 378.)

On October 13, 2010, plaintiff underwent a psychiatric evaluation with Agara S. Reddy, M.D., Plaintiff's chief complaints were anxiety and depression. Plaintiff reported increased depression and crying spells. He reported that he had difficulty concentrating and was easily distracted. He had frequent suicidal thoughts but no plans or intent to carry them out. He reported that he struggled to function, that his sleep was erratic, and that his medications did not seem to help. He had gained 50 pounds over the past year and stated that he ate food to comfort himself. Dr. Reddy wanted to rule out diagnoses of recurrent major depression, social anxiety disorder, dysthymia or mild long term depression, and adult onset attention deficit disorder (ADD.) Dr. Reddy suggested a trial of Adderall, used to treat ADD, and continued his other medications. Dr. Reddy assigned a GAF score of 65 and high GAF score of 70 for the past year. (Tr. 342-44.)

Plaintiff returned to Ms. Woods for counseling in late October 2010. He continued to struggle with mood swings and depression. (Tr. 340.) During a November 9, 2010 visit with Michelle R. Barg, M.D., a family practitioner, plaintiff reported that the Celexa was not very effective and that he was sad and cutting himself. Dr. Barg noted two well-healed scars on plaintiff's right forearm. (Tr. 382.)

On November 10, 2010, Thomas J. Spencer, Psy.D., evaluated plaintiff at the request of the Missouri Department of Social Services regarding Medicaid eligibility. Plaintiff reported the following. He had difficulty transitioning from grade school to middle school and was homeschooled briefly before eventually returning to public school. His anxiety worsened when he entered high school, and he was again homeschooled. He felt overwhelmed by anxiety. He felt that he was being judged by his peers and teachers and could not focus. He experienced increased anxiety and panic attacks in group settings. In the past, he had a couple of panic attacks per week. He described his mood as depressed most of the time. He had recurrent thoughts of suicide but had no suicide attempts or gestures. He lacked energy and motivation. He was unable to experience pleasure from activities he usually found enjoyable and had crying spells and poor attention and concentration. He recounted a history of cutting himself which began nine months earlier although he had not cut himself for three weeks. He cut himself when overwhelmed with emotion; the pain took his mind off emotional issues. He participated in activities of daily living, including hanging out with friends, playing football, and working out. Dr. Spencer diagnosed social anxiety disorder and recurrent moderate major depressive disorder. He assigned a GAF score of 50-55, indicating moderate to serious symptoms. He believed that plaintiff's mental illness would interfere with his ability to engage in employment. (Tr. 336-39.)

On November 24, 2010, plaintiff saw Dr. Reddy for follow-up. Plaintiff reported that he was feeling better and that he had completed his GED. He reported that Adderall helped his concentration and focus although its effectiveness decreased after a few weeks. He did not do much and saw his friends only occasionally. He did not talk much with his

parents. He could not function in light of the way he felt. He expressed interest in obtaining employment and in earning a bachelor's degree in psychology. He was seeing his therapist every other week. Dr. Reddy increased his Adderall. (Tr. 335.)

On May 24, 2011, plaintiff saw Melissa Hutchens, M.D., a psychiatrist, for a psychiatric evaluation. He was nineteen years old. Plaintiff denied any suicidal plan and said that he thought suicide was selfish. He reported a history of self-harm and was embarrassed that he had cut himself and left scars. He stated that he had cut himself to stop emotions and to feel alive and that cutting helped to soothe extreme anxiety. He worried constantly that others were judging him. While on medication he was able to go into some stores with his family, but he often stayed in the car because he felt unable to go inside. He became irritable when he was very anxious. He had not had any panic attacks since starting Klonopin eighteen months earlier. (Tr. 363-66.)

Plaintiff underwent evaluation for symptoms of attention deficit hyperactivity disorder (ADHD) with Dr. Hutchens. Dr. Hutchens stated:

> In addition to his trouble with concentration and indecision the patient was evaluated for symptoms of ADHD and he scored very highly on almost all symptoms of inattentiveness; qualifying him for diagnosis of Attention-Deficit Hyperactivity Disorder of the Inattentive Type only. He endorsed severe symptoms of sustaining attention and activities, being able to listen in conversation, sustaining follow through, trouble with organization, avoiding tasks that require sustained mental effort, losing important items, easy distractibility and forgetful in daily activities. He had minimal or mild symptoms of hyperactivity.

(Tr. 358-59, 366.) Plaintiff's school records indicated that plaintiff's IQ was consistent with normal intellect. Dr. Hutchens diagnosed major depressive disorder, generalized anxiety disorder, and ADHD, inattentive type. She assigned a GAF score of 50 and prescribed Vyvanse, used to treat ADHD. (Tr. 363-72.)

Dr. Hutchens saw plaintiff one month later on June 24, 2011. He was doing well that day but continued to have severe mood swings. His medications included Vyvanse, Celexa, Klonopin, and Trazodone. He reported that the Vyvanse was effective but that he

experienced increased anxiety during the day. Dr. Hutchens adjusted his medications and started him on Viibryd, an antidepressant. (Tr. 361.)

Plaintiff saw Dr. Hutchens again on August 4, 2011. He reported that he felt terrible, that he had nothing positive in his life, and that he would sometimes be up all night thinking and crying. Dr. Hutchens reviewed records from plaintiff's prior health providers and his academic and other records. Dr. Hutchens discontinued plaintiff's Viibryd and started him on Lithium, used to treat mania. (Tr. 362-63.)

Dr. Hutchens thought that plaintiff would have an extreme inability to find or maintain gainful employment. She believed that he would have significant problems relating to coworkers, the public, or supervisors due to high anxiety. She believed that plaintiff could not deal with a changing work environment or stressors and, even with medication, would continue to have poor concentration and indecisiveness. Severe symptomatology would interfere with his ability to maintain a normal workday or work week and he could not reliably keep a work schedule or be expected to behave in an emotionally stable manner on a consistent basis. She further noted that plaintiff had not shown improvement with several psychotherapeutic medications and that he required continued psychiatric pharmacotherapy. She believed that there was a slight chance that, with intensive psychiatric medication management and psychotherapy, he could further his education and possibly work part time. (Tr. 371.)

On August 7, 2011, Dr. Hutchens completed a Medical Assessment of Ability to do Work-related Activities (Mental). With the exception of the ability to relate to coworkers which he rated as good, Dr. Hutchens assessed all of plaintiff's abilities in the fair and poor range. Dr. Hutchens believed that plaintiff was unable to be around people other than close friends or family. He thought that he needed prompts for self-care, had difficulty completing tasks, became anxious over normal activities, had been unable to complete high school or maintain a normal routine due to high anxiety and inattentiveness, and could not perform a normal work day or work week. (Tr. 375-76.)

**Testimony at the Hearing**

An administrative hearing was held on August 18, 2011. (Tr. 31-91.) Plaintiff testified to the following. He was currently being treated by Dr. Melissa Hutchens and had recently started taking Lithium. He dropped out of school halfway through his freshman year of high school. Homeschooling was unsuccessful although he eventually obtained his GED. He hoped to eventually attend college part-time and was currently "just trying to get better." (Tr. 44.) His daily activities generally consisted of playing computer games. (Tr. 42-44.)

Richard L. Pollock, M.D., medical expert, also appeared and testified to the following. After reviewing the documentary record and listening to plaintiff's testimony, Dr. Pollock believed that Dr. Hutchens's report and RFC evaluation was a "pretty extreme variation" from the other records. (Tr. 49.) Plaintiff had been consistently diagnosed with a major depressive disorder, a generalized anxiety disorder, and ADD. He believed that Dr. Hutchens's opinions varied greatly from plaintiff's other providers. He believed that Dr. Hutchens had started plaintiff on Lithium after considering plaintiff's lack of improvement on various medications. He believed that Dr. Hutchens was overreacting to plaintiff's situation, noting that plaintiff's other treating sources did not see plaintiff as limited as did Dr. Hutchens. Dr. Pollack noted that Dr. Reddy's GAF scores of 65 and 70 indicated that plaintiff was functioning fairly well. Dr. Pollack believed that Dr. Hutchens's opinions seemed "very extreme." (Tr. 51.) He agreed that social situations were undoubtedly difficult for plaintiff, but that it was a matter of degree. Dr. Pollack also surmised that Dr. Hutchens may not have been accustomed to using the RFC forms in demonstrating functional impairments. (Tr. 48-52.)

Dr. Pollack opined that plaintiff had mild limitations in daily activities, marked limitations in social functioning, and moderate limitations in concentration. He believed that plaintiff's limitation in concentration, persistence, or pace was moderate because he had responded well to Adderall at different times and under different circumstances. Dr.

Pollack thought that plaintiff could not work with the public but could work with supervisors and have occasional contact with coworkers. (Tr. 54-57.)

Dr. Pollack reviewed a report from Donna Haley, an educational specialist who had reviewed plaintiff's academic records. Ms. Haley indicated that plaintiff's academic achievement was average or above in the primary grades and then dropped significantly beginning in the seventh grade. Dr. Pollack believed that Ms. Haley's report was a reasonable analysis. (Tr. 63-68, 217-18.)

The ALJ read a November 1, 2010 statement from plaintiff's mother into the record. Following his review of the evidence from plaintiff's mother, Dr. Pollack testified that had other mental health providers reviewed plaintiff's mother's statement, they likely would have found plaintiff's condition to be more serious. Dr. Pollack believed that Dr. Hutchens had a more complete medical record than the earlier doctors and that her assessment of plaintiff's limitations was consistent with the need for institutionalization. (Tr. 69-78, 213-16.)

Julie Harvey, vocational expert (VE), also appeared and testified at the hearing. The ALJ asked the VE to assume a hypothetical where the individual had no exertional limitations. The individual could remember and carry out detailed instructions, maintain attention and concentration with a low-paced environment as far as production issues and activity level, and could work in proximity to others in a small group of people and with only incidental interaction with the public. The VE testified that such an individual could perform work as a janitor, window cleaner, and floor waxer. When asked about an individual who was required to be "self-paced" on task performance and needed minimal interaction with supervisors, the VE testified that the individual could still perform the jobs previously identified. (Tr. 87-89.)

When asked about a hypothetical individual who had unscheduled absences averaging one day per week, the VE testified that such an individual would be unable to maintain employment because it would exceed the customary allowances for absences. (Tr. 88-89.)

## III. DECISION OF THE ALJ

On November 10, 2011, the ALJ found plaintiff not disabled. (Tr. 9-25.) The ALJ found plaintiff had the following severe impairments: major depressive disorder, generalized anxiety disorder, and ADD. (Tr. 11.) However, the ALJ concluded that plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 16-18.)

The ALJ determined plaintiff retained the RFC to perform work at all exertional levels involving detailed instructions. He must work in a self-paced work environment with low productivity issues and low activity level. He could have minimal and superficial interaction with supervisors, occasional interaction with co-workers in small groups, and only incidental interaction with the public. Plaintiff could adapt to a work situation. However, he needed additional time to respond to major changes in a work routine or work procedures and could not travel in unfamiliar places. The ALJ found plaintiff's impairments would not preclude him from performing work existing in significant numbers in the national economy. Consequently, the ALJ found plaintiff not disabled. (Tr. 18, 24-25.)

The ALJ evaluated the opinions and found the state agency opinion entitled to significant weight, but concluded that subsequent medical records supported greater limitations. (Tr. 19-20.) The ALJ found Dr. Pollack's opinion entitled to substantial weight as it was consistent with the treatment records, the narrative reports, the objective evidence, and the overall records. (Tr. 21-23.) The ALJ found Dr. Hutchens's opinion entitled to some, but not great, weight. The ALJ determined that Dr. Hutchens's opinion was inconsistent with her own treatment notes and the notes of other medical providers. (Tr. 14-15, 19-21.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are

supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred in failing to properly consider and weigh the opinions of treating psychiatrist Dr. Melissa Hutchens and therapist Christina Woods. The undersigned disagrees on both counts.

The ALJ found Dr. Hutchens's opinion entitled to some, but not great, weight. The ALJ determined that Dr. Hutchens's opinion was extreme and inconsistent with her treatment notes, as well as those of the other medical providers. (Tr. 14-15, 19-21.) The ALJ found the state agency opinion entitled to significant weight but concluded that subsequent medical records supported greater limitations. (Tr. 19-20.) The ALJ found Dr. Pollack's opinion entitled to substantial weight because it was consistent with the treatment records, the narrative reports, the objective evidence, and the overall records. (Tr. 21-23.)

The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c). Further, an ALJ is not obligated to defer to a treating physician's medical opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in the record." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005)). See also Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008) (ALJ is charged with responsibility of resolving conflicts among medical opinions).

The undersigned concludes the ALJ properly considered the record as a whole and found that Dr. Hutchens's opinion was inconsistent with the record as a whole. See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.")). Dr. Pollack reviewed Dr. Hutchens's opinion and testified that Dr.

Hutchens's "very extreme" opinion would suggest the individual should be institutionalized. (Tr. 21, 51-52, 77.) However, despite treating plaintiff, Dr. Hutchens did not hospitalize plaintiff or suggest that he be hospitalized. The extreme limitations set forth by Dr. Hutchens were also inconsistent with plaintiff's treatment records. (Tr. 21). During his treatment, plaintiff appeared alert, oriented, and cooperative with normal speech, good eye contact, and intact thought processes, memory, concentration, insight, and judgment. (Tr. 235, 237-38, 242, 244-45, 338, 343, 354, 363, 369, 382.) See Halverson, 600 F.3d at 930 (while claimant's symptoms waxed and waned between appointments, for the most part she was attentive, alert, focused, and appropriate when examined). Dr. Pollack also thought Dr. Hutchens's GAF score of 50 was inconsistent with her RFC assessment. (Tr. 77-78, 357, 372.) See Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The ALJ therefore properly found Dr. Hutchens's opinion entitled to some weight.

Plaintiff next argues that Dr. Hutchens's opinion is entitled to controlling weight as a treating source because plaintiff had seen Dr. Hutchens on three occasions. The ALJ is required to assess the record as a whole to determine whether a treating physician's opinion is consistent with substantial evidence on the record. 20 C.F.R. § 416.927(c)(4). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). See 20 C.F.R. § 416.927(c)(2). An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Id.; see also Hacker, 459 F.3d at 937; 20 C.F.R. § 416.927(c)(4).

Plaintiff also suggests Dr. Hutchens's opinion is consistent with other record evidence, noting that Dr. Hutchens's GAF score of 50 is consistent with those assessed by Ms. Woods and Dr. Spencer. However, Dr. Pollack testified that although the GAF scores

are consistent, they are still inconsistent with Dr. Hutchens's opinion. (Tr. 77-78.) The undersigned agrees.

Plaintiff suggests Dr. Hutchens's opinion is consistent with statements made by Dr. Spencer and Ms. Woods. As part of a Medicaid application, Dr. Spencer stated that plaintiff's mental impairment interfered with his ability to engage in employment suitable for his "age, training, experience, and/or education." (Tr. 339.) Dr. Spencer's opinion was not only conclusory, but was also a statement regarding vocational factors outside of his area of expertise. See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of Commissioner to make ultimate disability determination); 20 C.F.R. § 416.927(d) (2013).

Likewise, Ms. Woods stated at a March 10, 2010 state court paternity hearing on child support that plaintiff would not be able to work 40 hours a week nor could he live independently of his parents. (Tr. 211-12.) Ms. Woods's opinion regarding plaintiff's ability to work is again an opinion on an issue reserved for the Commissioner. See House, 500 F.3d at 745. The timing of Ms. Woods's statement should also be considered. Following the March 2010 state court hearing, plaintiff was diagnosed with ADD and started on new medication that improved his functioning. (Tr. 56, 335, 343, 383.)

Neither Dr. Spencer nor Ms. Woods provided medical opinions. Instead, they made statements regarding issues reserved exclusively for the Commissioner. The undersigned concludes that the ALJ properly evaluated the record as a whole and assigned the proper weight to the various medical opinions. Accordingly, plaintiff's argument that the ALJ erred by failing to properly consider and weigh the opinions of Dr. Hutchens and Ms. Woods is without merit.

To the extent plaintiff is questioning the ALJ's credibility determination, the undersigned finds that consistent with Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), the ALJ properly found that plaintiff's allegations of disabling symptoms were not supported by the medical evidence. (Tr. 13-16.) See 20 C.F.R. § 416.929(c)(1)-(2) (ALJ

should look at the medically documented "signs" and findings to determine the intensity and persistence of the symptoms and how they actually affect the person); Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider."). Despite alleging disabling mental impairments, plaintiff appeared alert and oriented with intact cognition. (Tr. 77, 171, 235, 237-38, 243-45, 250, 252, 262, 332, 343, 363, 382-83, 385.) He was cooperative with normal speech, good eye contact, and intact thought processes, memory, concentration, insight, and judgment. (Tr. 235, 237-38, 242, 244-45, 338, 343, 354, 363, 369, 382.) The medical record evidence does not therefore support the extent of plaintiff's alleged mental limitations. (Tr. 13-16.)

The ALJ also found plaintiff's daily activities inconsistent with his allegations. Plaintiff retained the ability to maintain his personal care, play video games, use a computer, work out, play football, watch television, and spend time with family and friends to some extent. (Tr. 36, 44-45, 182-83, 187, 190-91, 193-94, 214, 275, 287, 301, 303, 309-10, 335, 337, 342, 351, 356, 361.) Despite his mental impairments, plaintiff prepared for and passed the GED exam on his first attempt. (Tr. 12-13, 19, 21, 44, 177, 314, 262, 303, 337, 340, 364, 369.) Plaintiff also enrolled in online college courses. (Tr. 13, 177, 335, 351.) Contrary to his claims of difficulty with others, he could shop at times and spend time with friends and family. (Tr.13, 194, 284, 303, 309-10, 335-37, 351, 355, 361, 368, 371). Cf. McCoy v. Astrue, 648 F.3d 605, 614 ((8th Cir. 2011) (Acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain). The ALJ properly weighed plaintiff's daily activities in assessing his credibility and found them inconsistent with his allegations.

Plaintiff argues the ALJ failed to give him an opportunity to explain his impairments. However, contrary to plaintiff's claim, the ALJ asked plaintiff about his daily activities, his medical treatment, and his symptoms, and plaintiff provided a written statement describing his symptoms which was read into the record at the administrative hearing. (Tr. 42-46, 60-63, 73, 190-97, 207-08.) The ALJ properly found that many of

plaintiff's complaints reflected his level of functioning prior to starting treatment and prior to the relevant time period.

The ALJ also properly considered plaintiff's mother's third-party function report and letter. (Tr.179-85, 214-15.) However, the ALJ properly found the statements not credible because--as with plaintiff's statements--his mother's statements were inconsistent with the medical evidence and relied on incidences prior to plaintiff's treatment and the relevant time period. These incidents do not therefore support a finding of disability during the relevant time period.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 25,  2014.